Filed 8/28/14  P. v. Sandoval CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS ALBERTO ZAPIEN SANDOVAL,<br><br>    Defendant and Appellant. | F065604<br><br>(Fresno Super. Ct. No. F11900056)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Gregory W. Brown, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Carlos Alberto Zapien Sandoval was charged with multiple felony offenses based on stealing two cars, changing the vehicle identification number (VIN) on the first stolen car, and leading an officer on a high speed chase while driving

the second stolen car. As to the first stolen car, he was convicted of count I, unlawfully taking or driving a vehicle (Veh. Code,[1] § 10851, subd. (a)); and count III, unlawfully altering a VIN (§ 10802). As to the second stolen car, defendant was convicted of count IV, unlawfully and willfully evading an officer (§ 2800.2, subd. (a)); count V, possession of a deadly weapon (Pen. Code, § 12020, subd. (a)); and count VI, unlawfully taking or driving the car. He was sentenced to two years eight months.

On appeal, defendant contends the court should have granted his motion to exclude his prearrest statements because they were involuntary and coerced. Defendant also contends the jury was not correctly instructed on the corpus delicti, and on the elements of count IV, unlawfully and willfully evading an officer. We affirm.

## FACTS

## THEFT OF PANTALEON'S CAR (Counts I, II, and III)

Santos Pantaleon purchased a 1995 black, two-door Honda Civic from his friend, Estevan Iribe. The car had a dent on the fender and the outline of a star on the rear window where a Dallas Cowboys sticker had been peeled off.

Around 5:00 p.m. on April 4, 2010, Pantaleon left the Honda parked in front of his house in Selma and walked to a nearby store. The Honda was locked, the windows were closed, and the keys were inside his house. When Pantaleon returned to his house, his Honda was gone. Pantaleon reported the stolen car to the police and told Iribe what happened.

### Discovery of the stolen car

On May 8, 2010, Estevan Iribe was driving on South Bliss Avenue in Laton when he saw the stolen Honda parked on the lawn in front of a house. Iribe immediately recognized his former vehicle because of the dent on the fender and the sticker outline on the window.

---

[1] All further statutory citations are to the Vehicle Code unless otherwise indicated.

Iribe drove away from the area and was going to call 911 when he saw a patrol car from the Kings County Sheriff's Department. He flagged down the vehicle and told Deputy Zuniga that he was sure that he found a stolen vehicle. Deputy Zuniga asked if he had any way to identify the car. Iribe told Zuniga about the fender and the sticker outline. Iribe said he had the vehicle information at home. Deputy Zuniga told Iribe to retrieve the vehicle information. In the meantime, Zuniga was going to drive by the house and look at the car, and then he would return to the location where Iribe flagged him down and collect the vehicle information.

Deputy Zuniga drove to the house on South Bliss and saw the black Honda parked on the lawn. He stayed in his patrol car and saw the dent and the sticker outline described by Iribe. He ran a check on the license plate and the car was not reported stolen. The license plate was registered to a 1994 Honda Civic. Deputy Zuniga could not determine whether the Honda was a 1994 or 1995 model.

Deputy Zuniga drove back to meet Iribe, who gave him documents with the Honda's VIN and license plate number. Zuniga ran a check on the license plate and determined it had been reported stolen.

**The deputies contact defendant's family**

Deputy Zuniga drove back to the house on South Bliss, and Deputy Brabant arrived as backup. The deputies walked up to the black Honda, which was still parked on the front lawn, and looked through the window at the VIN on the front dashboard. The VIN did not match the number provided by Iribe. There were scratch marks over the chrome where the VIN was located, and the dashboard had been freshly painted. Deputy Zuniga testified it was clear the original VIN had been changed.

Luis Sandoval, Jr., (Luis Jr.) walked out of the house and asked the deputies what they wanted.[2] Deputy Zuniga explained the Honda had been reported stolen and asked

---

[2] Luis Jr. was later identified as defendant's brother. We will refer to certain parties by their first names to avoid confusion; no disrespect is intended.

3.

for the keys. Luis Jr. said there was no way the car was stolen because he had owned it for four years and sold it to his brother the previous year. Luis Jr. said his brother had the keys, and he was not home.

Deputy Zuniga called the California Highway Patrol (CHP) for further backup to continue the investigation. The two deputies waited with Luis Jr. for about 20 minutes.

CHP Officer Mike Trenholm arrived at the house and was briefed by Officer Zuniga. Officer Trenholm asked Luis Jr. who owned the Honda. Luis Jr. said it belonged to his brother, Edison, who was not home. Luis Jr. said he had owned the car for four years, and he sold the car to Edison a year and a half ago. Trenholm asked Luis Jr. to unlock the car. Luis Jr. again said he did not have the keys.

Officer Trenholm called a tow truck to unlock the Honda. The tow truck operator arrived, unlocked the vehicle, and popped open the hood. Officer Trenholm checked the VIN located on the engine compartment's firewall. It was the same VIN provided by Iribe and it matched the license plates for Pantaleon's stolen Honda; it did not match the VIN displayed on the Honda's dashboard or the license plates on the vehicle.

Officer Trenholm placed Luis Jr. in handcuffs because he believed Luis Jr. was attempting to conceal stolen property.

After Luis Jr. had been detained, his father (Luis Sr.) appeared and spoke to the officers. His mother also was present. Luis Sr. gave permission for the officers to search the garage area. They found car parts and license plates from other Honda vehicles. Luis Sr. said he did not know where the parts came from.

**Defendant arrives at the house**

After Luis Jr. had been handcuffed, defendant and Edison Zapien Sandoval (Edison) arrived at the house; they were Luis Jr.'s brothers. Officer Trenholm testified he had been conducting the investigation for about 30 minutes when they arrived.

Officer Trenholm spoke to Edison since Luis Jr. had identified him as the owner of the car. Trenholm explained about the investigation and asked about the Honda.

4.

Edison said he bought the car from Luis Jr. over a year earlier. Trenholm replied that was impossible because the car had been stolen a month ago.

Officer Trenholm testified that based on Edison's statements, he decided that Edison was also attempting to conceal stolen property, and placed him in handcuffs. Trenholm asked Edison about who changed the license plates and VIN on the car. Edison said he didn't know, then said defendant may have switched them four to six months earlier. Trenholm again explained the car had been stolen a month earlier. Edison said defendant did some work on the car about a month ago.

**Defendant's prearrest statements[3]**

While Officer Trenholm spoke to Edison in the driveway, defendant remained at the house and stood under the carport with his father and the two deputies. Trenholm testified defendant became loud and argumentative with the deputies. Deputy Zuniga told Trenholm that defendant wanted to speak to him. Defendant walked up to Trenholm, and he was still loud and argumentative. Trenholm told defendant that he would not talk to him if he continued to yell.

Defendant calmed down and apologized for being upset. Defendant also said, " 'Man, these guys don't deserve that,' " and " 'Take me instead.' " Trenholm asked defendant what he meant. Defendant said he stole the car in Selma and his brothers had nothing to do with it. Defendant said someone gave him a ride to Selma, and he saw a black Honda parked near a store which was very similar to Edison's Honda. Defendant said the car was unlocked and the keys were in the ignition, and he drove away in it. Defendant said he "flipped" the car. He took the license plates and VIN from Edison's Honda and put them on the stolen car because Edison's Honda ran poorly. Defendant

---

**3** In issue I, *post*, we will address defendant's contentions that his prearrest statements to Officer Trenholm were obtained in violation of *Miranda* because Trenholm interrogated him, and that his statements were also involuntary and coerced because he saw his two brothers in handcuffs. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

also said he took the parts and frame from Edison's Honda and discarded them around the county. Trenholm asked defendant if Edison had anything to do with flipping the Honda. Defendant said no, but that Edison had to have known what happened.

Officer Trenholm arrested defendant for the stolen car and placed him in handcuffs.

## Defendant's postarrest statements

Officer Trenholm placed defendant in his patrol car, advised him of the warnings pursuant to *Miranda*, *supra*, 384 U.S. 436, and drove him to the jail. During the drive, defendant asked what he was being charged with. Trenholm said he was charged with auto theft, possession of stolen property, VIN switching, and operating a chop shop. Defendant asked Trenholm how he identified the Honda as being stolen. Trenholm said he looked at the confidential VIN and it matched the stolen car. Defendant said, " 'I should have done that one too. If I had, you guys would have never known.' "

## Charges and convictions

Based on the theft of Pantaleon's car, defendant was charged with count I, unlawfully taking or driving a vehicle (§ 10851, subd. (a)); count II, receiving a stolen motor vehicle (Pen. Code, § 496d, subd. (a)); and count III, unlawfully altering the VIN (§ 10802). Defendant was convicted of counts I and III. The jury did not return a verdict for count II, consistent with the court's instructions that if the jury found defendant guilty of count I it must return the verdict forms unsigned for count II.

### MEDINA'S STOLEN CAR (Counts IV, V, VI, VII)

As explained above, Officer Trenholm arrested defendant on May 8, 2010, for his theft of Pantaleon's car. However, defendant did not remain in custody.

On the morning of August 22, 2010, Victor Medina discovered his 1988 four-door white Honda Civic had been stolen while it was parked in front of his house in Hanford. He immediately reported the stolen car.

6.

**The car chase**

At 2:00 a.m. on August 23, 2010, Deputy Patrick Beggs of the Fresno County Sheriff's Department was on patrol near Golden State and Central Avenues in south Fresno. He was wearing a uniform and driving a marked sheriff's department patrol car with lights and siren. He saw a white Honda preparing to make a left turn in the intersection. The Honda suddenly veered right and drove northbound in the opposing southbound lane. Beggs testified that driving the wrong way in the opposing lane was a major traffic hazard, in violation of section 21651, subdivision (b).[4]

Deputy Beggs immediately turned around, activated his patrol car's lights and siren, and attempted to perform a traffic stop on the white Honda. The vehicle continued driving the wrong way in the opposing lane. It accelerated to a high rate of speed, and a chase ensued on Golden State for a short period of time. The Honda's driver abruptly stopped, and the car skidded to a stop. Deputy Beggs was about 100 yards behind the Honda and immediately stopped.

The driver of the Honda performed a U-turn, drove over the median between Golden State and the frontage road, and then accelerated on the frontage road. The Honda's brakes were smoking, and debris from the median flew onto the patrol car's windshield. The driver briefly lost control and the Honda went into a spin, then the driver regained control and accelerated to 70 miles per hour on the frontage road. The area was posted at 25 miles per hour.

Deputy Beggs testified the driver of the Honda committed several traffic violations: making a sudden stop without signaling (§ 22109), driving over a dividing road barrier (§ 21651, subd. (a)); and making an unsafe turn without signaling (§ 22108).

---

[4] As we will discuss in issue III, *post*, defendant was convicted in count IV of felony evading an officer in violation of section 2800.2, subdivision (a). Defendant contends the court failed to properly instruct the jury on the element of willful or wanton disregard based on the commission of certain predicate traffic offenses as required by statute.

The Honda continued on the frontage road until it approached a dead end. The driver swerved back onto Golden State and ran two stop signs, in violation of section 22450. The driver again lost control, and the Honda slammed into a guardrail and finally came to a stop. The car was going about 70 miles per hour when it ran the first stop sign, and it was going 30 to 35 miles per hour when it went through the second stop sign and crashed into the guardrail.

**Defendant flees from the stolen car**

Deputy Beggs pulled behind the damaged Honda and aimed his spotlight at the vehicle. A man got out of the driver's door, and Beggs could clearly see his face and entire body. Beggs later identified defendant as the driver.

Defendant ran away from the Honda. Deputy Beggs drew his Taser and followed him on foot for about 100 yards. Defendant jumped a chain link fence that was topped with barbed wire. Defendant was caught on the barbed wire. He rolled over the fence, landed hard on his side, and then got up and kept running.

Deputy Beggs was unable to jump the fence because of his gear, and defendant was too far away to deploy his Taser. Several backup units arrived in the area, but the officers could not find defendant.

Deputy Beggs returned to the white Honda. The car's entire front end, including the hood and windshield, had major damage from crashing into the guardrail. There was a crack on the inside of the windshield, consistent with someone striking his head. The metal guardrail and wooden supports on the road had been knocked backwards, damaged, and bent.[5]

---

[5] Deputy Beggs testified it was a violation of "section 20000.2" to cause property damage and flee the scene. Defendant notes that such a section does not exist. Beggs likely misspoke and must have meant section 20002, subdivision (a), which states: "The driver of any vehicle involved in an accident resulting only in damage to any property, including vehicles, shall immediately stop the vehicle at the nearest location that will not impede traffic or otherwise jeopardize the safety of other motorists .…"

8.

Beggs determined the Honda had been reported stolen by Victor Medina. There was a loaded sawed-off shotgun, a box of shells, a screwdriver, and a cell phone in the front seat.

Lieutenant Hanson examined the cell phone and called a frequent name on the call list, which turned out to be defendant's former girlfriend. Hanson testified she said defendant did not own a car, they had spoken earlier that evening, and then blurted out: " 'Did he steal a car?' "[6] She provided information which led to defendant's identity. The deputies went to his residence on South Bliss Avenue in Laton, but defendant was not there.

**Defendant's arrest**

Around midnight on August 25, 2010, an officer was on patrol in Laton when he performed a traffic stop on a vehicle for improper use of its high beam lights. The vehicle turned onto South Bliss Avenue and parked at defendant's residence. Defendant and three other people were in the car. Deputy Beggs responded to the scene and identified defendant as the driver of the stolen car. Defendant had a freshly-cut lip consistent with his face hitting the steering wheel during the crash into the guardrail. He also had a fresh gash on his arm consistent with climbing over the barbed wire fence and hitting the ground.[7] Defendant was arrested.

**Charges and convictions**

Based on the theft of Medina's car and the car chase, defendant was charged with count IV, willfully and unlawfully evading an officer (§ 2800.2, subd. (a)); count V, possession of a deadly weapon (Pen. Code, § 12020, subd. (a)); count VI, unlawfully

---

[6] Lieutenant Hanson was called as a rebuttal witness and testified about the former girlfriend's statement.

[7] Edison Sandoval, defendant's brother, testified for the defense that defendant suffered the injuries to his lip and arm when he was beaten by several unknown men at a park in Laton.

9.

taking or driving a vehicle; and count VII, receiving a stolen motor vehicle. Defendant was convicted of counts IV, V, and VI. The jury did not return a verdict for count VII, consistent with the court's instruction not to return a verdict on that count if it found defendant guilty of taking the vehicle.

## DEFENSE EVIDENCE

Defendant testified that he bought Pantaleon's stolen Honda at a swap meet in Fresno for $400 about two weeks before the officers found the car at his house. The seller did not give him any paperwork. Defendant had an idea that the car was stolen based on the circumstances of the sale. Defendant bought the car because he had crashed his brother's Honda and damaged it, and he wanted to make it up to him. Defendant switched the license plates and VIN from his brother's Honda, and put them on the car from the swap meet.

Defendant testified that when he arrived at his house and saw his brothers in handcuffs, he became upset and told the officers his brothers had nothing to do with the car. Defendant testified he told the officers that he bought the Honda at a swap meet, and admitted he switched the plates and VIN.

As for the car chase, defendant testified he was not driving the white Honda and he did not jump the fence. Defendant claimed a guy named "Shorty" gave him a ride in the white Honda earlier that evening. Shorty asked defendant to help him find some medical marijuana. They talked about the deal, defendant got out of the car, and he accidentally left behind his cell phone when he got out. He never saw a shotgun in the car. Defendant said he later spoke to his former girlfriend, and she denied that she made any statements to the officers about whether he had stolen a car.

## REBUTTAL

Officer Trenholm testified that when he spoke to defendant at his house about the black Honda, defendant never said he bought it at a swap meet.

10.

Deputy Beggs testified he spoke with defendant after he was arrested on August 25, 2010, and asked about the car chase. Defendant seemed surprised that Beggs knew who he was, or that he was asking about the car chase. Defendant paused and stammered as he responded to the questions. Defendant said he had been in "Shorty's" white Honda for a quick drive, and he drove the car around for awhile. He could not provide any details about Shorty's identity but said Shorty looked like him. Defendant did not mention any deal about medical marijuana. Deputy Beggs told defendant that they found his cell phone in the stolen Honda and asked defendant about his injuries. Defendant said he was injured in a fight at a park but could not provide any details about when or where it happened.

## DISCUSSION

### I.  Admissibility of defendant's prearrest statements

Defendant contends the court should have granted his motion to exclude the prearrest statements he made to Officer Trenholm while they were standing in front of his house, when he admitted that he stole the car and switched the VINs. Defendant's motion was based on two arguments: His statements were inadmissible because they were (1) obtained in violation of *Miranda*, and (2) involuntary and coerced because he saw his brothers being arrested and placed in handcuffs.[8]

On appeal, he contends his statements were involuntary and coerced, and does not directly address the *Miranda* issue. We will address both issues on appeal.

*A.  Custodial interrogation*

We begin with the well settled principles regarding custodial interrogation. The advisement of the *Miranda* warnings is only required when a person is subject to custodial interrogation. Custodial interrogation has two components. First, the person being questioned must be in custody. (*People v. Mickey* (1991) 54 Cal.3d 612, 648

---

[8] Defendant has not separately challenged the admissibility of the statements he made after he was arrested and when he was in the patrol car.

11.

(*Mickey*); *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088 (*Mosley*).) "Custody, for these purposes, means that the person has been taken into custody or otherwise deprived of his freedom in any significant way. [Citation.]" (*Mosley, supra,* 73 Cal.App.4th at p. 1088.)

The second *Miranda* component is obviously interrogation. (*Mickey, supra,* 54 Cal.3d at p. 648; *Mosley, supra,* 73 Cal.App.4th at p. 1088.) "For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. [Citation.]" (*Mosley, supra,* 73 Cal.App.4th at p. 1089.)

"Absent 'custodial interrogation,' *Miranda* simply does not come into play. [Citations.]" (*Mickey, supra,* 54 Cal.3d at p. 648.) "[V]olunteered statements not the product of interrogation are admissible." (*People v. Edwards* (1991) 54 Cal.3d 787, 815.) A police officer is not obligated to prevent a suspect from volunteering incriminating statements. (*Id.* at p. 816.) Neither spontaneous nor volunteered statements are the products of interrogation and are not barred by the Fifth Amendment or subject to the requirements of *Miranda.* (*Miranda, supra,* 384 U.S. at p. 478; *Rhode Island v. Innis* (1980) 446 U.S. 291, 299–300; *People v. Ray* (1996) 13 Cal.4th 313, 337; *Mickey, supra,* 54 Cal.3d at p. 648.)

In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained. [Citations.]" (*People v. Smith* (2007) 40 Cal.4th 483, 502.) We apply federal standards in reviewing a defendant's claim that a challenged statement was obtained in violation of *Miranda.* (*People v. Bradford* (1997) 14 Cal.4th 1005, 1043.)

## B. *The evidentiary hearing*

Defendant filed a pretrial motion to exclude the prearrest statements he made to Officer Trenholm. The court conducted an evidentiary hearing and Trenholm was the only witness.

Officer Trenholm testified he arrived at the house on South Bliss around 5:00 p.m., and he met the two deputies in the front yard. They briefed him about the possible stolen car and switched VINs. There were three police vehicles parked in front of the house; these cars belonged to Trenholm and the two deputies since they had separately arrived. Trenholm testified no other officers were present. The officers never entered the house, and they never removed their firearms from their holsters during the entire incident.

Luis Jr. was standing on the front porch when Officer Trenholm arrived. Trenholm determined the car had been stolen. Trenholm asked Luis Jr. about the car. Luis Jr. said he had nothing to do with it, and the car belonged to his brother, Edison. Trenholm told Luis Jr. the car had been reported stolen a month earlier. After speaking with Luis Jr., Trenholm decided to detain him for being in possession of stolen property, and placed Luis Jr. in handcuffs.

After the detention, Luis Jr.'s father arrived. The other deputies asked for and received permission from Luis Sr. to search other parts of the property.

Officer Trenholm testified that about 30 to 45 minutes after his initial arrival at the house, Edison and defendant walked up to the front yard. At this point, there were four or more members of defendant's family present. Everyone was standing in front of the house. Luis Jr. was still in handcuffs.

Officer Trenholm spoke separately to Edison and asked him about the stolen car. Edison said he bought the car from Luis Jr. over a year earlier. Trenholm told Edison the car had been reported stolen a month ago and the license plates had been switched. Edison said defendant had done some work on the car about four to six months earlier,

13.

and the plates may have been switched then. Trenholm told Edison that was impossible since the car had been stolen just a month ago. Edison then said he had lied, and defendant worked on the car about a month earlier. After the conversation, Trenholm decided to detain Edison for being in possession of a stolen vehicle, and placed him in handcuffs.

Officer Trenholm testified both Luis Jr. and Edison were in handcuffs and standing in the front yard, but they would have been separated from each other.

Officer Trenholm testified defendant and other family members remained in the front yard while Trenholm spoke to Edison. After Trenholm detained Edison, he heard defendant become very loud with Deputy Zuniga. Zuniga advised Trenholm that defendant wanted to talk to him about the case. Defendant walked up to Trenholm by himself, without being escorted by a deputy. Defendant was loud and argumentative. Trenholm told defendant that he would not speak to him unless defendant "toned it down a little bit."

Officer Trenholm testified defendant agreed to calm down. The other two deputies were still standing outside the house, but they were not standing near defendant. Trenholm believed he talked to defendant about 15 minutes after defendant had arrived at the house. They remained in the front yard.

Officer Trenholm asked defendant about the stolen car. Trenholm testified that most of defendant's response "was narrative, but at some point I did have clarifying questions." Defendant said something "similar to, 'Man, those guys don't deserve that,' referring to his two brothers." Trenholm asked defendant what he was talking about. Defendant said he stole the car, he switched the VIN from his brother's car to the stolen car, and his brothers had nothing to do with it.

Officer Trenholm testified that based on defendant's statements, he decided defendant was the primary person responsible for the stolen car, and detained him in handcuffs.

14.

### 1. The parties' arguments

After Officer Trenholm's testimony, defense counsel argued defendant's prearrest statements should be excluded because of a *Miranda* violation. Counsel conceded defendant was not technically in custody outside the house because he had not been placed in handcuffs. However, counsel argued Trenholm had been investigating the stolen car for 45 minutes. Trenholm knew the car was stolen and the VIN had been switched, and Edison's statements implicated defendant in the VIN switch. Counsel argued Trenholm should have advised defendant of the *Miranda* warnings, even though he was not in custody because Trenholm knew his questions were going to elicit an incriminating response, particularly after defendant said his brothers did not deserve to be arrested.

Defense counsel further argued defendant's statements were involuntary because defendant could see that his brothers had already been placed in handcuffs. Defendant may have felt he was also going to be detained, and his knowledge about his brothers' situation triggered his involuntary statement that they did not deserve it.

The prosecutor replied defendant was not in custody to trigger the *Miranda* warnings, Officer Trenholm was not required to give *Miranda* advisements during an investigation, and defendant voluntarily walked up to Trenholm and asked to speak with him. Defendant's statements were voluntarily because the conversation occurred in front of his house with numerous family members present.

### C. *The court's ruling*

The court denied defendant's motion to exclude his prearrest statements. The court found Officer Trenholm was not required to advise defendant of the *Miranda* warnings, and defendant was not in custody just because three officers were present or his brothers were being detained. The officers did not display their firearms, order him to remain on the property, or conduct a patdown search. The incident occurred at his father's house, and defendant was not in handcuffs. The court also found defendant

voluntarily approached Trenholm, asked to speak with him, and voluntarily said that his brothers were not involved.

### D. Defendant was not in custody

In his motion before the superior court, defendant argued Officer Trenholm should have advised him of the *Miranda* warnings when he spoke to him in front of the house. As explained above, however, the advisement of the *Miranda* warnings is only required when a person is subject to custodial interrogation. (*Mickey, supra,* 54 Cal.3d at p. 648; *Mosley, supra,* 73 Cal.App.4th at p. 1088.) The first question is whether defendant was in custody. The test for whether an individual is in custody is objective, i.e., " '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citations.]" (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; see also *People v. Stansbury* (1995) 9 Cal.4th 824, 830; *People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

Where no formal arrest has taken place, we must determine "whether a reasonable person in defendant's position would have felt he or she was in custody." (*Stansbury, supra,* 9 Cal.4th at p. 830.) "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 442, fn. omitted; *Stansbury, supra,* 9 Cal.4th at p. 830.)

"Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323; *In re Joseph R.* (1998) 65 Cal.App.4th 954, 960.) "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. [Citations.]" (*Stansbury v. California, supra,* 511 U.S. at p. 325.)

16.

In contrast to a custodial situation, a person who is temporarily detained and subject to investigatory questioning is not necessarily in custody for purposes of *Miranda*. (*Berkemer, supra,* 468 U.S. at pp. 438–440; *People v. Farnam* (2002) 28 Cal.4th 107, 180; *People v. Rivera* (2007) 41 Cal.4th 304, 309; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1754.) Indeed, *Miranda* itself held that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.... In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (*Miranda, supra,* 384 U.S. at pp. 477–478, fn. omitted.)

"[T]he term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. [Citation.]" (*People v. Farnam, supra,* 28 Cal.4th at p. 180.) An investigatory detention allows "the officer [to] ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*Berkemer, supra,* 468 U.S. at p. 439.)

An investigatory detention was at issue in *People v. Clair* (1992) 2 Cal.4th 629 (*Clair*), where several police officers were dispatched to an apartment to investigate a reported burglary. A rear kitchen window revealed signs of entry. An officer knocked, announced he was a police officer, and received no response. The officers were admitted into the apartment by the building manager. The defendant was under the covers in a bed in the bedroom. An officer approached the defendant with gun drawn and ordered him not to move. The officer asked the defendant who he was, if he had identification, and if he lived there. The defendant gave a false name and admitted he did not live there. The officer asked the defendant what he was doing there. The defendant said he had spent the previous night with a woman who lived in the apartment. The officer determined the resident did not know the defendant and arrested him for burglary. (*Id.* at pp. 648-649.)

17.

*Clair* rejected the defendant's argument that he should have received *Miranda* warnings, and held he was not subject to custodial interrogation when the officer questioned him in the bedroom. Clair held the defendant was not in custody, and the incident was the type of " '[g]eneral on-the-scene questioning as to facts surrounding a crime' " that did not trigger the requirement for *Miranda* warnings. (*Clair, supra,* 2 Cal.4th at p. 679.) The defendant was only subject to "a temporary detention for investigation," and the officer "did no more than was permitted" to determine why the defendant was in that particular location. (*Ibid.*) The officer's decision to draw his gun was "altogether reasonable under the circumstances" and did not raise the detention to a custodial situation. (*Ibid.*)

*Clair* also held the defendant was not subject to "interrogation." (*Clair, supra,* 2 Cal.4th at p. 679.)

> "To be sure, the term ' "refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." ' [Citations.] But it apparently does not extend to 'inquiries' – like those here – that are essentially 'limited to the purpose of identifying a person found under suspicious circumstances or near the scene of a recent crime[.]' [Citation.]" (*Id.* at pp. 679–680.)

### 1. Analysis

In this case, defendant was not under arrest, in custody, or detained in any way when he made his prearrest inculpatory statements to Officer Trenholm. The entire incident occurred in the front yard of his residence. The three officers never drew their service weapons, held anyone at gunpoint, or threatened anyone with arrest. Luis Jr. was already in custody when defendant walked up to his house. Defendant stood in the front yard with other family members as Trenholm spoke to Edison. Defendant was not in custody, and none of the officers directed him to stay at the house or prohibited him from leaving.

18.

When Officer Trenholm spoke to Edison, Edison potentially implicated defendant in switching the VINs, which likely led Trenholm to believe defendant was involved in the stolen car. However, there is no evidence that defendant heard the conversation, knew what Luis Jr. or Edison had said, or that Trenholm said anything to indicate defendant was going to be taken into custody.

To the contrary, defendant remained in his front yard as Officer Trenholm spoke to Edison and there is no evidence the officers ordered him to remain there while Edison was being questioned. Instead, defendant suddenly became loud and agitated when he saw Trenholm place Edison in handcuffs. Defendant voluntarily walked up to Trenholm and demanded to speak to him, but Trenholm initially refused to talk to him unless he calmed down. Defendant calmed down and still asked to speak to Trenholm, and then spontaneously said that his brothers did not deserve it. At that point, Trenholm was still conducting the same type of investigatory, on-the-scene questioning about a crime as permitted by *Miranda* and described in *Clair*. Defendant was not in custody, and he was not subject to interrogation when Trenholm asked the clarifying question about what defendant meant. (*Clair*, *supra*, 2 Cal.4th at p. 679.) Defendant gave another spontaneous statement and admitted he stole the car and switched the VINs.

Defendant was never in custody and, in the absence of custody, Officer Trenholm's conversation with defendant did not constitute custodial interrogation requiring the advisement of the *Miranda* warnings.

### E. Defendant's statements were voluntary

Defendant's primary appellate argument is that his prearrest statements to Officer Trenholm were involuntary and coerced because he was reacting to Trenholm's act of placing both Luis Jr. and Edison in handcuffs, which was an "implied threat" that his brothers would be arrested or punished unless he said something.

The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution prohibit the use of involuntary statements made to law enforcement

19.

officers.  (*People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*); *People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*).)  When a defendant challenges his or her statements as involuntary, the prosecution bears the burden of proving voluntariness by a preponderance of the evidence.  (*Lego v. Twomey* (1972) 404 U.S. 477, 489; *Massie, supra,* 18 Cal.4th at p. 576.)  Whether a defendant's statements are voluntary is subject to independent review.  (*Massie, supra,* 19 Cal.4th at p. 576; *People v. Holloway* (2004) 33 Cal.4th 96, 114.)

A statement is involuntary or coerced if it is "obtained by physical or psychological coercion, by promises of leniency or benefit, or when the 'totality of circumstances' indicates the confession was not a product of the defendant's 'free and rational choice.'  [Citations.]"  (*People v. Cahill* (1993) 5 Cal.4th 478, 482, fn. 1.)  "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.'  [Citations.]"  (*Neal, supra,* 31 Cal.4th at p. 79.)  In considering the totality of the circumstances, the relevant factors include " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'  [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 635, 660.)

"In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]"  (*Massie, supra,* 19 Cal.4th at p. 576.)  "Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.'  [Citation.]  The statement and the inducement must be causally linked.  [Citation.]"  (*People v. Maury* (2003) 30 Cal.4th 342, 404–405.)

A confession will not be rendered involuntary when the police make neither a threat nor a promise, "but simply [make] an accurate statement of the circumstances."

20.

(*People v. Thompson* (1990) 50 Cal.3d 134, 170.)  It is also permissible for an officer to suggest "possible explanations of the events" and offer defendant "an opportunity to provide details of the crime."  (*People v. Carrington* (2009) 47 Cal.4th 145, 171.)

### 1.  Analysis

Defendant's statements to Officer Trenholm were voluntary.  As explained above, defendant arrived at his house after Luis Jr. had already been placed in handcuffs.  Defendant's father and other family members were present.  Everyone remained in the front yard.  None of the officers drew their service weapons or ordered defendant to remain on the property during the investigation.  The two deputies did not guard or restrain defendant while Trenholm spoke to Edison.  There is no evidence that defendant was aware of what either Luis Jr. or Edison had told Trenholm, or that Edison had implicated defendant in working on the stolen car within the previous month.

Officer Trenholm separately spoke to Edison while defendant apparently remained at some distance from them.  Defendant did not display any agitation when he arrived at his house and saw Luis Jr. in handcuffs, or when Trenholm asked to speak with Edison.  Defendant did not become agitated until he saw Edison being placed in handcuffs.  Even at that point, however, there is no evidence that any of the officers threatened defendant with being arrested or taken into custody because of the stolen car, or that they advised him that he would also be placed in handcuffs because of whatever his brothers had said.  Instead, defendant voluntarily approached Trenholm and demanded to speak with him.  Trenholm refused to speak to him unless he calmed down.  Defendant insisted on speaking to him and spontaneously said that his brothers were being unfairly arrested.  Trenholm asked a clarifying question about what he meant, and defendant voluntarily confessed to stealing the car and switching the VINs.

Defendant argues Officer Trenholm's conduct caused him "stress and excitement" because he was a uniformed officer who handcuffed both his brothers in the front yard of his family's home, and he was coerced by police action.  Defendant concedes he initiated

the conversation with Trenholm, but asserts he "did so under the implied threat that his brothers would be arrested ('taken away')." Defendant further argues that his "prime motivation in speaking to Trenholm was to prevent his brothers' imminent arrest, and he was prepared to sacrifice himself to protect his brothers from such a fate. There can be no doubt, then, that [defendant's] subsequent confession was coerced by an implied threat to arrest or punish his close relatives."

It is well recognized that threats or promises relating to a defendant's parents or other relatives "may also cause a defendant's will to be overborne." (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209; *People v. Weaver* (2001) 26 Cal.4th 876, 920; see, e.g., *People v. Wimberly* (1992) 5 Cal.App.4th 773, 787–788 [threat to the defendant that his mother would be arrested]; *People v. Kelly* (1990) 51 Cal.3d 931, 953 [exploitation of mother's fears that she would not see children without a confession]; *People v. Boggs* (1967) 255 Cal.App.2d 693, 700–701 [the defendant made confession to aid wife]; *U.S. v. McShane* (9th Cir.1972) 462 F.2d 5, 6–8 [the defendant's confession made to assist girlfriend].) In this case, however, there is no evidence Officer Trenholm or the two deputies made any threats toward defendant or his family, express or implied, such that defendant's will was overborne and he was compelled to blurt out his confession to Trenholm. While defendant may have been distressed to see his brothers in custody, there is no evidence that Trenholm placed Luis Jr. and Edison in handcuffs to coerce or threaten defendant to confess in exchange for their release. To the contrary, Trenholm placed each brother in custody after they separately made inculpatory statements to him indicating their knowing possession of a stolen vehicle: Luis Jr. insisted he had owned the car for several years, and Edison similarly claimed he bought the car from Luis Jr. over a year earlier. Based on their statements, Trenholm clearly had probable cause to take them into custody for their knowing possession of a stolen vehicle.

Defendant asserts Officer Trenholm "leveraged the coercive situation" to "extract[] a confession" from him. Defendant's assertion is not supported by the

22.

evidence. Defendant voluntarily insisted and demanded to speak to Trenholm, even though Trenholm refused to speak with him while he was agitated and upset. Defendant voluntarily confessed to stealing the car and switching the VINs. His statements were not coerced or involuntary, and the court properly denied defendant's motion to exclude.

## II.      CALCRIM No. 359

Defendant next contends his convictions must be reversed in counts I and III, for the theft of Panatelon's car and switching the VIN, because the jury was improperly instructed with CALCRIM No. 359, the corpus delicti rule, as follows:

> "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.
>
> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.
>
> "*The identity of the person who committed the crime may be proved by the defendant's statements alone*.
>
> "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

Defendant points to the italicized sentence above regarding the suspect's identity, and argues the instruction reduced the prosecution's burden of proof on the issue of identity. Defendant concedes he failed to object to this instruction, but argues he has not waived review of the instruction because the purported erroneous language affected his substantial rights (Pen. Code, § 1259). Even presuming we may reach this issue, defendant's instructional contentions are meritless and the jury was correctly instructed on the corpus delicti rule.

### A.  Corpus delicti

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself – i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).)

The prosecution must establish the corpus delicti independent from the admissions of the defendant, thus assuring the accused does not admit to a crime which did not occur. (*Id.* at p. 1169.) "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citations.]" (*Id.* at p. 1171.)

"The amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as 'slight' [citation] or 'minimal' [citation]. The People need make only a prima facie showing ' "permitting the reasonable inference that a crime was committed." ' [Citations.] The inference need not be 'the only, or even the most compelling, one ... [but need only be] a *reasonable one....*' " (*People v. Jones* (1998) 17 Cal.4th 279, 301–302, italics in original.) "In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*Alvarez, supra,* 27 Cal.4th at p. 1171.)

The identity of the defendant as the perpetrator is not part of the corpus delicti; identity may be established by the defendant's words alone. (*People v. Frye* (1998) 18 Cal.4th 894, 960, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### B. The instruction

"Whenever an accused's extrajudicial statements form part of the prosecution's evidence, the cases have additionally required the trial court to *instruct* sua sponte that a finding of guilt cannot be predicated on the statements alone. [Citations.]" (*Alvarez, supra,* 27 Cal.4th at p. 1170, italics in original; *People v. Najera* (2008) 43 Cal.4th 1132,

1137.)  The corpus delicti rule is defined in CALCRIM No. 359 and its predecessor, CALJIC No. 2.72.  (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258–1259.)

As explained above, the court in this case gave the pattern instruction of CALCRIM No. 359.  Defendant relies on *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*) and argues the third paragraph of CALCRIM No. 359, regarding the suspect's identity, was confusing and reduced the prosecution's burden of proof.  We disagree with *Rivas*'s holding on this point.

*Rivas* held the first two paragraphs of CALCRIM No. 359 correctly state the corpus delicti rule.  However, *Rivas* held the pattern instruction was confusing because of the third paragraph about the declarant's identity.  (*Id*. at p. 1429.)

> "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime – and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALJIC No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party.  The instruction requires reconsideration." (*Id.* at p. 1429.)

*Rivas* acknowledged that in *People v. Foster* (2010) 50 Cal.4th 1301 (*Foster*), California Supreme Court upheld CALJIC No. 2.72, the predecessor corpus delicti instruction.  *Rivas* distinguished *Foster* because "[t]he wording of CALJIC No. 2.72 is quite different" and the predecessor instruction properly explained that identity was not an element of the crime, whereas CALCRIM No. 359 failed to do so.  (*Rivas*, *supra*, 214 Cal.App.4th at pp. 1429–1430.)

We disagree with *Rivas* and believe the better view is expressed in *People v. Rosales*, *supra*, 222 Cal.App.4th 1254 [rev. den.], which reviewed the purpose of the corpus delicti rule, disagreed with *Rivas*, and held the third paragraph of CALCRIM No. 359 was not confusing:

> "It is … well-established that a defendant's inculpatory out-of-court statements *may* … be relied upon to establish his or her identity as the

25.

perpetrator of a crime. [Citations.] This is because the perpetrator's identity is not part of the corpus delicti. [Citations.]

"CALCRIM No. 359, like CALJIC No. 2.72, clearly so states. The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]72 which has been approved by our Supreme Court .… As noted, CALJIC No. 2.72 states in part: 'The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission].' CALCRIM No. 359 states with greater precision and economy of language, 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALJIC No. 2.72, which was approved by our Supreme Court in *Foster,* contains no such reminder." (*Rosales*, *supra*, 222 Cal.App.4th at pp. 1260–1261; see also *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.)

We agree with Rosales's analysis of the corpus delicti rule and CALCRIM No. 379, and similarly conclude the instruction was not confusing and did not mislead the jury.[9]

III.    **Instruction on count IV**

Defendant next contends that we must reverse his conviction in count IV for felony evasion of an officer with willful or wanton disregard in violation of section 2800.2. This charge was based on Deputy Beggs's testimony about the high speed chase of Medina's stolen car. Defendant argues the jury was not instructed on an element of

---

[9] Defendant separately contends that his convictions must be reversed because of the impact of the alleged cumulative errors from the admission of his prearrest statements and the corpus delicti instructions. Given our rejection of these assertions, we similarly find there was no cumulative error.

26.

the offense – which traffic offenses constituted "point" violations within the statutory definition of willful or wanton disregard.

Defendant did not object to the instruction for count IV, but argues he has not forfeited review of this issue because the court had a sua sponte duty to give correct instructions on the general principles of law relevant to issues raised by the evidence, particularly the elements of the charged offense. (See, e.g., *People v. Mutuma* (2006) 144 Cal.App.4th 635, 640 (*Mutuma*).) As we will explain, any instruction error is harmless under the facts of this case.

### A. Felony evasion

Under section 2800.1, it is a misdemeanor if a person "who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude" a uniformed peace officer in a marked patrol car with lights flashing and siren sounding. (§ 2800.1, *Mutuma*, *supra*, 144 Cal.App.4th at p. 641.)

Defendant was convicted of violating section 2800.2, subdivision (a), which makes it a felony when a person "flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and *the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property ....*" (§ 2800.2, subd. (a), italics added; *Mutuma*, *supra*, 144 Cal.App.4th at p. 641.)

Section 2800.2, subdivision (b) further states:

> "(b) For purposes of this section, a willful or wanton disregard for the safety of persons or property *includes, but is not limited to*, *driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs*." (Italics added.)

As to the point-violation definition of willful or wanton disregard, "[s]ection 12810 provides that several specifically enumerated violations … are assigned one or two points. [Citations.] It also contains the catch-all clause providing that, with certain exceptions, 'any other traffic conviction involving the safe operation of a motor vehicle

27.

upon the highway shall be given a value of one point.' [Citation.]" (*Mutuma*, *supra*, 144 Cal.App.4th at p. 641.)

A defendant charged with felony evasion under section 2800.2, subdivision (a) is charged with one " 'discrete criminal event,' " which is flight in a vehicle from the officer's pursuit. (*People v. Datt* (2010) 185 Cal.App.4th 942, 950.) There is "but one flight from pursuit," which is continuous and is not divided into discrete criminal events. (*Ibid*.) When the evidence shows but a single violation of section 2008.2, the unanimity instruction is not required simply because the jury may not have agreed on the predicate "willful or wanton" violations. (*People v. Varela* (2011) 193 Cal.App.4th 1216, 1220.) "The different Vehicle Code violations upon which the 'willful or wanton' element could [be] premised [are] simply 'alternate ways of proving' that element, not separate chargeable offenses of reckless evading." (*People v. Datt*, *supra*, 185 Cal.App.4th at p. 950.) While there may be evidence of "various factual bases for a jury finding that defendant's flight from pursuit was done in 'willful or wanton disregard for the safety of persons or property,' jury unanimity is not required as to the exact way the defendant is guilty of a single discrete crime." (*Ibid*.) Instead, the jury must be instructed to "unanimously agree that defendant's flight from pursuit was in willful or wanton disregard for the safety of persons or property," but the jury is not required "to agree on the 'exact way' in which defendant's flight from pursuit was in willful or wanton disregard for the safety of persons or property." (*Ibid*.)

### B. CALCRIM No. 2181

In this case, the court instructed the jury with CALCRIM No. 2181, the pattern instruction on the elements of count IV, felony evasion: a peace officer driving a motor vehicle pursued defendant; defendant willfully fled from, or tried to elude the officer; the officer was in uniform and his vehicle was distinctively marked; and "[d]uring the pursuit, the defendant drove with willful or wanton disregard for the safety of persons or property."

CALCRIM No. 2181 also defined "willful or wanton," consistent with section 2800.2, subdivision (b), as follows:

"Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.

"A person acts with wanton disregard for safety when (1) he is aware that his actions present a substantial and unjustifiable risk of harm, (2) and he intentionally ignores that risk. The person does not, however, have to intend to cause damage.

"Driving with willful or wanton disregard for the safety of persons or property includes, but is not limited to, *causing damage to property while driving or committing three or more violations that are each assigned a traffic violation point*." (Italics added.)

The pattern instruction includes an alternate version for the final paragraph, to define the predicate traffic offenses:

"[Driving with willful or wanton disregard for the safety of persons or property includes, but is not limited to, causing damage to property while driving or committing three or more violations that are each assigned a traffic violation point.] [¶] [*<insert traffic violations alleged>* **are each assigned a traffic violation point**.]" (CALCRIM No. 2181, bold print added.)

In this case, the court did not give the bolded paragraph or otherwise define the predicate traffic offenses which would have resulted in one-point violations within the meaning of sections 12810 and 2800.2, subdivision (b).

### 1. Analysis

At trial, defendant testified he was not driving the Honda during the high speed chase. Defendant claimed he had been in the car earlier in the evening; "Shorty" was driving it; defendant mistakenly left his cell phone in the car when he got out; and "Shorty" drove away in the car.

On appeal, however, defendant argues the court erroneously failed to instruct the jury on the predicate traffic offenses to prove willful or wanton disregard, and whether he

29.

committed traffic offenses during the car chase which met the "point count" definitions in section 12810. Defendant concedes that Deputy Beggs testified about the violation of specific traffic laws, but argues his testimony was insufficient and inaccurate to satisfy the statutory elements of willful or wanton disregard in the absence of the correct instruction.

Defendant contends the court's failure to define the predicate traffic violations was contrary to this court's opinion in *Mutuma*, *supra*, 144 Cal.App.4th 635. *Mutuma* held the predicate traffic offenses of section 2800.2 and section 12810 raised questions of law and not of fact. "[A]ny three violations for which points are assessed against the driver's license under section 12810 are predicate offenses under section 2800.2 as a matter of law, so no jury findings [are] called for on that issue." (*Mutuma*, *supra*, 144 Cal.App.4th at p. 638.) "If the claimed predicate offenses are not enumerated in section 12810 but arguably fall into a catch-all provision of that section [citation], assessing one point for all violations 'involving the safe operation of a motor vehicle upon the highway,'" that also raises a question of law "and there is no need for a jury determination." (*Ibid*.) "The catch-all provision means simply that a point should be assessed for every traffic violation involving a motor vehicle, with specific, stated exceptions. Applying this rule, the trial judge should determine whether the violations asserted by the People are point violations and instruct the jury accordingly." (*Ibid*.)

*Mutuma* held the trial court did not commit error when it failed to instruct the jury to decide whether or not three traffic violations constituted willful or wanton disregard because those were questions of law properly resolved by the court. (*Mutuma*, *supra*, 144 Cal.App.4th at p. 643.) *Mutuma* also held the court's failure to instruct on property damage as alternate proof of willful or wanton disregard was harmless. There was undisputed evidence of property damage, and defendant "could not have been harmed by the court's failure to tell the jury that the property damage evidence was one more basis on which it could find him guilty." (*Ibid*.)

30.

As applied to this case, the court did not include the alternate paragraph of CALCRIM No. 2181 or define the predicate traffic offenses which satisfied section 12810 as a matter of law. As in *Mutuma*, the court should have determined whether the evidence supported culpability under a point-count theory, identified the relevant offenses supported by the evidence, and instructed the jury accordingly.

The court's error, however, is harmless under any standard. The evidence established overwhelming proof of defendant's guilt under both definitions of willful or wanton disregard. Deputy Beggs testified without contradiction that the driver of the stolen Honda committed traffic offenses within the meaning of section 12810. Defendant drove the wrong way in an opposing lane (§ 21651, subd. (b)), and failed to stop in the event of an accident causing property damage (§ 20002, subd. (a)), which are enumerated two-point traffic violations identified in section 12810, subdivisions (a) and (d)(1).[10]

Defendant also ran two stop signs (§ 22450), exceeded the posted and statutory maximum speed limits (§§ 22349, 22350), made a sudden stop without signaling (§ 22109), drove over a dividing road barrier (§ 21651, subd. (a)); and made an unsafe turn without signaling (§ 22108). While these are not enumerated point violations, they are within section 12810, subdivision (f)'s "catch-all clause providing that, with certain exceptions, 'any other traffic conviction involving the safe operation of a motor vehicle upon the highway shall be given a value of one point.' [Citation.]" (*Mutuma*, *supra*, 144 Cal.App.4th at p. 641.) Defendant's conduct clearly satisfies this definition given Deputy Beggs's description of his reckless, unsafe, and hazardous driving during the high speed chase and evasion.

As a separate matter, there was overwhelming evidence of the alternate statutory definition of driving with willful or wanton disregard – "causing damage to property

---

[10] As explained above, Deputy Beggs testified defendant violated the Vehicle Code when he crashed and damaged the stolen car into the guardrail and fled, but erroneously identified the statute as "section 20000.2."

while driving." (§ 2800.2, subd. (b).)  Deputy Beggs testified defendant crashed the stolen Honda into a metal guardrail.  The roadway's guardrail and wooden supports were knocked backwards, damaged, and bent.  The stolen Honda's entire front end, including the hood and windshield, had major damage.  Defendant never disputed Deputy Beggs's testimony about the property damage, and the evidence satisfied the alternate statutory requirement for willful or wanton disregard, thus rendering any instructional error as to the predicate traffic offenses as harmless under any standard.  (See, e.g., *People v. Copass* (2009) 180 Cal.App.4th 37, 42.)

## DISPOSITION

The judgment is affirmed.

_____

Poochigian, J.

WE CONCUR:

_____

Levy, Acting P.J.

_____

Cornell, J.